UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Latasha Lorraine Askins, | ) | C/A No. 4:12-3547-RBH-KDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | REPORT AND RECOMMENDATION |
| vs. | ) | |
| | ) | |
| Starting Point, Heather Quenault, Maria | ) | |
| Roundtree, Larry Wiseburn, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

      Plaintiff Latasha Lorraine Askins ("Plaintiff" or "Askins") filed this action pro se in the United States District Court, Florence Division, on December 17, 2012, seeking recovery against her former employer, Stating Point; Starting Point Program Director, Heather Quenault; Starting Point employee, Maria Roundtree; and Starting Point Director, Larry Wiseburn. In her pro se Complaint, Plaintiff claims that, during her employment with Starting Point, she was "sexually harassed, sexually battered, intimidated, verbally and emotionally abused by staff in upper-management positions." Compl. 3, ECF No. 1. Plaintiff alleged she was fired by Quenault and Roundtree for filing a written complaint about her alleged treatment. *Id.* The court construes her Complaint as bringing causes of action for retaliation and for harassment/hostile work environment, both pursuant to Title VII, 42 U.S.C. § 2000e. This matter comes before the court on Defendants' Motion for Summary Judgment, ECF No. 56, to which Plaintiff filed a response, ECF No. 60. Having considered those briefs, as well as Defendants' Reply, ECF No. 61, and Plaintiff's Surreply, ECF No. 63, the undersigned submits this Report[1] recommending Defendants' Motion be granted and the case be dismissed with prejudice in its entirety.

---

[1] All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Local Civil Rule 73.02(B)(2)(g) (D.S.C.). Because the Motion for Summary

I.     Factual Background[2]

Starting Point of Darlington, LLC ("Starting Point") is a licensed narcotic treatment clinic offering rehabilitation and maintenance programs to persons dependent on opium, morphine, heroin, and other derivatives of that group. Upon admission, clients receive an orientation and psycho-social assessment completed by the client's primary counselor. Quenault Aff. ¶ 6, ECF No. 56-6. The client and counselor develop an individualized treatment plan and the onsite physician determines the dosage and schedule for narcotic treatment medication. *Id.* ¶ 7. The client's primary counselor monitors the client's progress at least every 90 days during the first year of the treatment plan and at least every six months thereafter. *Id.* All clients must undergo random urine drug testing on a monthly basis. The clinic requires patients to disclose prescription medications which may test positive on a urine drug screen. If a client tests positive for an illicit/non-prescribed substance, the client is "phased down" which means the client may lose the privilege of receiving take-home medication. If a counselor notes a positive drug screen, the counselor has the power to "phase down" a client subject to any appeal to the program director who gives the counselor's recommendation substantial deference. *Id.* ¶ 8.

On June 13, 2011, Starting Point's Program Director, Defendant Quenault, hired Plaintiff as an addiction counselor. *See* Job Description signed by Plaintiff on June 13, 2011, ECF No. 56-1. In addition to a copy of her job description, Defendants have provided a copy of Starting Point's "Agency Code of Ethics" that Plaintiff signed upon being hired, as well as a "Certification of Compliance" that

---

Judgment is dispositive, this Report and Recommendation is entered for the District Judge's consideration.

[2] In considering Defendants' Motion, the court has reviewed the facts as set forth in that Motion and its accompanying affidavits and exhibits, ECF No. 56, Defendant's Reply and its affidavits and exhibits, ECF No. 61, as well as the facts set forth in Plaintiff's Complaint, ECF No. 1, and her Response to Defendants' Motion and its accompanying exhibits, ECF No. 60. The court sets out facts herein that provide background and those that potentially are relevant to Plaintiff's claims and Defendants' defenses. Plaintiff, proceeding pro se, has not submitted any affidavits setting out facts, so her facts are not verified in the record.

Plaintiff signed, indicating she had read and understood Starting Point's "compliance statements and supporting policies[.]" ECF Nos. 56-2, 56-3.

Plaintiff was terminated on November 2, 2011. *See* Quenault Aff. ¶ 11, ECF No. 56-6; Pl.'s Dep. 64, ECF No. 56-7. The parties disagree about the reason for Plaintiff's termination. Defendants indicate Plaintiff was terminated based on her handling of a situation with "J.B.," a client of Starting Point who was assigned Plaintiff as his addiction counselor.[3] *See* Defs.' Mem. 2-4, ECF No. 56; Quenault Aff. ¶¶ 9-11, ECF No. 56-6. Plaintiff submits she was terminated because of a written complaint she made regarding actions of Defendants Quenault and Roundtree, as well as other co-employees not named as defendants in this matter. *See* Pl.'s Mem. 4, ECF No. 60; Incidents Report, ECF No. 60-1 at 1 (also available at 56-5); Oct. 31, 2011 email to Wiseburn ("Subject: Incident Report"), ECF No. 60-1 at 6. The undated "Incidents Report" details events of October 25 and 26, 2011, and Plaintiff emailed it to Defendant Wiseburn on October 31, 2011. *See id.* Plaintiff also complains of harassing, abusive treatment by Defendant Wiseburn on June 15, 2011, and submits a document entitled "Larry Wiseburn's Incident." Pl.'s Mem. 4, ECF No. 60; ECF No. 60-1 at 2.[4] In her deposition, Plaintiff also more generally claims Wiseburn harassed her. Pl.'s Dep. 92, ECF No. 56-7 (indicating Wiseburn "did not come to her defense" and he "is basically the mental abuse and intimidation").

Plaintiff has also proffered a handwritten "Log of Events" cataloging alleged events of "sexual harassment" from July 6 to November 2 [2011]. Log of Events, ECF No. 60-1 at 7-10. *See also* Pl.'s Mem. 4. She referred to the Log of Events in her deposition. *See, e.g.*, Pl.'s Dep. 71, ECF No. 56-7 at 18. Defendants do not concede the admissibility of the "Log of Events" or her testimony and complaints

---

[3] During Plaintiff's deposition, the parties agreed to refer to this client by his initials, "J.B." The court notes, however, that the record now includes an affidavit from J.B. that includes his full name. This Report does not include J.B.'s full name because it is not germane to the court's analysis.

[4] It is unclear whether Plaintiff provided Defendants with the written document called "Larry Wiseburn's Incident" prior to this litigation and, if so, when.

of matters referenced therein but not included in her pre-termination "Incidents Report," but argue those "unsubstantiated allegations" do not "reveal a severely hostile work environment." Defs.' Reply 3 & n.1, ECF No. 61. Even considering Plaintiff's claims in the "Log of Events," the undersigned's recommendation remains the same.

A. Written Complaint from Client J.B.

In an undated letter addressed "To whom it may concern," Starting Point patient "J.B." detailed "the disrespectful and absolute[ly] unprofessional way [he] was treated by [his] counselor [Plaintiff] on Monday October 24, 2011." Complaint Letter, ECF No. 56-4. Defendants indicate the written grievance letter was submitted on October 30, 2011. Quenault Aff. ¶ 9, ECF No. 56-6. Plaintiff acknowledges an "incident" between J.B. and her, but alleges it took place "around mid to late September of 2011[.]" Pl.'s Mem. 2. As set forth below, Plaintiff also presents a different version of what transpired between them. Plaintiff questions the signed form provided by Defendants, indicating she "has every reason to believe that the flow and size of the letters don't match J.B.'s previous handwriting plus the client [did] not ever present[] any papers or documents to the plaintiff showing him capable of typing a letter of that sort." *Id.* (citing to J.B. Complaint Letter, ECF No. 60-1 at 3-4).[5]

In the grievance, J.B. states that Plaintiff called him on Monday, October 17 and indicated she needed a copy of his prescriptions. Complaint Letter 1, ECF No. 56-4. J.B. stated Plaintiff had told him she needed the copies that day or indicated she would "phase down" his clinic privileges. She told him he could take copies to the clinic or fax them to her. J.B. explained that he lived in Bennettsville, had no car, and did not know of a place where he could use a fax machine. *Id.* J.B. asked whether he could

---

[5] The court sets forth the facts as presented by both parties, remaining mindful that it considers all properly supported issues of material fact in favor of Plaintiff, the non-moving party. As noted in more detail below, however, the mere existence of alleged disputes of fact between the parties does not necessarily defeat a properly supported motion for summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48.

provide her the copies when he came to the clinic the following Monday for an appointment, but Plaintiff told him it could not wait. *Id.* The client found a fax machine at a local library, faxed the prescriptions, and received a fax confirmation page. *Id.* When he went to the clinic for his appointment the following Monday, October 24, 2011, he asked Plaintiff whether she had received his fax. *Id.* J.B. indicated that, "in what [he could] only describe as a hostile tone," Plaintiff replied that she had never received the fax and that she was going to phase him down. *Id.* J.B. stated Plaintiff "continued to get louder and louder until every patient and staff member could [hear] what was going on." *Id.* J.B. indicated Plaintiff "all but called [him] a liar," but did permit him to drive back to his home to retrieve copies of his prescriptions. *Id.* When J.B. returned with the prescriptions and fax confirmation, Plaintiff "turned her attitude from me and on to the other employees[,] stating that 'people'" were not giving her "stuff" to her. *Id.* J.B. stated Plaintiff continued to mispronounce his name despite having been corrected. He told Plaintiff he wanted to switch counselors. Plaintiff told him it was his right to switch, but she did not tell him how to go about doing so. *Id.* J.B. ended the letter by noting he had been a client for nearly five years and had never before had any problems with his counselors or with the rules. *Id.* at 1-2. J.B. stated he "was treated like a prisoner, like a liar, and all around piece of crap by someone who [he is] supposed to feel comfortable with and open up to about [his] personal life[,]" and formally requested a change of counselors. *Id.* at 2.

In addition to questioning whether J.B. wrote the document and disputing when the incident between them took place, Plaintiff also takes issue with J.B.'s account of the events. *See* Pl.'s Mem. 2-4. She states that "around mid to late September of 2011," J.B. asked her whether she had received his fax, and she told him she had not received a fax, was not aware that a fax had been sent, and that, pursuant to protocol, J.B. would be subject to a phase down. Pl.'s Mem. 2, ECF No. 60. Plaintiff alleges J.B. "instantly became angry and accused the plaintiff of calling him a liar[,] [and] continued to stand

directly over" her and "tried to intim[id]ate" her by "demanding that he not be subjected to a phase down." *Id.* Plaintiff explains that she "feared J.B. would strike any minute because it had been well documented by previous staff members that J.B. has an intense anger and temper problem." *Id.* at 2-3. Plaintiff stated that she then walked up front to "notify Maria [Defendant Roundtree] and the rest of the staff." *Id.* at 3. Plaintiff indicated that J.B. followed her up front and "caused a huge scene himself in front of fellow clients." *Id.* Plaintiff said J.B. stayed up front and talked with Defendant Roundtree for approximately 30 minutes, after which Roundtree went to Plaintiff's office and informed her that "J.B. would no longer be a client of the plaintiff's due to J.B.'s anger toward the plaintiff." *Id.* Plaintiff said that "was the end of the situation" and she did not hear about it again until Defendants were contacted by the Equal Employment Opportunity Commission ("EEOC"). *Id.* Plaintiff indicated that J.B., as the client, was responsible for informing her, the counselor, when a fax was being sent and that, if he had done so, she would have looked out for a fax from him. *Id.* Plaintiff noted counselors did not usually receive faxes from clients because of confidentiality concerns, and she had been "totally blind-sided about the fax." *Id.*

In Reply, Defendants proffer the affidavit of J.B. (using his full name). J.B. Aff., ECF No. 61-1. In the affidavit, J.B. authenticates the Written Complaint/Request to Change Counselors as one he wrote and gave to Defendants, confirms the date of his appointment when the confrontation took place as having been October 24, 2011, and provides copies of the faxed prescriptions. *See id.*

Plaintiff submitted an "Opposition to Defendants' Addendum," in which she again attacks the evidence presented by Defendants. Pl.'s Surreply, ECF No. 63. She argues that Defendants fabricated the evidence and impugns J.B.'s credibility. Plaintiff also questions the validity of the documents attached to the affidavit, arguing there is no proof they were actually faxed and that the transmission report could have related to "any document or fax sent by someone else[.]" *Id.* at 3.

B.  Plaintiff's Written "Incidents Report" Submitted to Defendants

On October 31, 2011, Plaintiff emailed an internal, written "Incidents Report" to Defendant Wiseburn. Incidents Report, ECF No. 60-1 at 1 (also available at 56-5); Oct. 31, 2011 email to Wiseburn ("Subject: Incident Report"), ECF No. 60-1 at 6. The undated Report details events of October 25 and 26, 2011.  ECF No. 60-1 at 1. Plaintiff indicates she was "ganged up on" by Defendant Roundtree and coworkers Kathy Wilkins, Shannon O'Neal, and Serria Evans "for not gossiping, eating lunch with them on [her] off time, and for not talking to them about their personal problems." *Id.* Plaintiff indicates that the "whole staff" told her she had an "attitude problem" for not doing these things. *Id.* Much of the Report focuses on actions of Kathy Wilkins, who is not a party to this litigation. Plaintiff indicates Wilkins told her she is not friendly, is paranoid, and needs psychiatric help. *Id.* Plaintiff also complains that Wilkins blames her for problems caused by computer error and "is using [her] as a scapegoat for her problems and taking all her anger out" on Plaintiff. *Id.* Plaintiff also indicates that the "Staff seem to have personal resentments toward [her] that [she is] not responsible for controlling." *Id.* Plaintiff indicates in her report that she had not mentioned these things before because she did not wish to be "dramatic," but she felt patients were "starting to notice everything[,]" and she felt the staff was trying to make Plaintiff appear to be the "troublemaker, when [she is] not the one causing the trouble." *Id.* Plaintiff states she does not feel responsible for "making staff feel better about themselves or for satisfying any staff members' sexual needs, for that is one of the reasons for four of the staff members' resentment toward [Plaintiff]." *Id.* Plaintiff indicates Serria Evans is "not included in the satisfying sexual needs parts." *Id.* Plaintiff stated she only asked staff to "<u>RESPECT</u>" her by calling her by her name, "not child or crazy." *Id.* (emphasis in original). Finally, Plaintiff indicates that on October 26, 2011, Wilkins had accused Plaintiff of vandalizing her car "because [Plaintiff is] so crazy[,]" but noted she had not spoken to Wilkins about her false accusations. *Id.*

Plaintiff submits she was terminated in retaliation for submitting her internal Report about Kathy and others. *See* Pl.'s Dep. 62-64, ECF No. 56-7.

## C. Plaintiff's Additional Allegations

In her deposition and her "Log of Events," Plaintiff also indicates several additional events related to "sexual harassment." *See* Pl.'s Dep. 71-90, ECF No. 56-7; Log of Events, ECF No. 60-1.[6] Plaintiff submits she was sexually harassed by the touching of her buttocks and the hitting of her breast. Pl.'s Dep. 71. Plaintiff testified that Defendant Quenault touched her buttocks on September 14, 2011, when Plaintiff was trying to "squeeze by" Quentault. Pl.'s Dep. 78-80. Plaintiff stated Quenault's hand "touched" and "felt" Plaintiff's buttocks, and Plaintiff quickly moved away or else Quenault "probably would have done more." *Id.* at 78-79. Plaintiff also complains that on July 6, 2011, when Plaintiff and Quenault were moving boxes to straighten up after the move into a new building, Defendant Quenault "hit her hand against [Plaintiff's] breast[,]" and "became angry." Pl.'s Dep. 80. Plaintiff described the touch of her breast as a "slap with the back of her hand" that caused her breast to bounce. *Id.* at 81.

Plaintiff also testified that later on July 6, 2011, Defendant Quenault hit Plaintiff's breast with a roll of tissue paper. Pl.'s Dep. 80, 82. Plaintiff indicated Quenault removed a roll of tissue from a box Plaintiff was holding and, although it was unnecessary for her to have removed the tissue roll, Quenault removed the roll and hit Plaintiff's breast "hard" with it. *Id.* at 82-24. Plaintiff indicated that hit hurt her more than the earlier slap of her breast. *Id.* at 84.

Plaintiff also testified that Defendant Quenault "always" showed her breasts, propping them up on a desk so that Plaintiff was able to see the areolas. Pl.'s Dep. 84, 87. Plaintiff indicated this happened on July 6, August 10, October 5, October 12, and October 19. *Id.* at 84, 88. Plaintiff testified that she

---

[6] As noted above, Defendant does not concede events listed in the Log or discussed in deposition or otherwise that were not included in her written Incidents Report appropriately are considered on summary judgment. *See* Reply, ECF No. 61.

believed Quenault intentionally situated her breasts so that Plaintiff could see a portion of her nipples. *Id.* at 87.

Plaintiff also testified that Defendants Quenault and Roundtree cornered her in a blind spot and felt her buttocks. Pl.'s Dep. 88. Plaintiff indicated that Defendant Roundtree would show Plaintiff pictures of women "shaking their behinds[,]" and that Roundtree would ask Plaintiff whether she would want to see Roundtree's naked behind. *Id.* at 88-89. Plaintiff testified she told Roundtree she did not wish to see her naked behind, but that Roundtree showed Plaintiff "the crack of her buttocks where she stated she fell on the chair and hurt it." *Id.* at 89. Plaintiff testified she complained to Roundtree by explaining she was straight. Plaintiff said she complained about four times, but it became useless because Roundtree "wasn't stopping." *Id.* at 89-90. Plaintiff indicated Roundtree did not fire her for any of the complaints about Roundtree's actions, but that Roundtree would threaten to fire her when she complained. *Id.* at 89-90.

Plaintiff also testified she complained to one of the company owners, Dr. Steve Merlin, but that he would not look at Plaintiff's paperwork showing her complaints. Pl.'s Dep. 90-91. Merlin did not fire Plaintiff and let "them handle everything." *Id.* at 91.

Plaintiff stated she tried to relay the incidents to Defendant Wiseburn on October 28, but that he told her no one was doing anything to her and she was crazy. *Id.* at 91. Wiseburn told Plaintiff she could submit a written incident report if she wished. *Id.*

D. Plaintiff's Allegations Against Wiseburn

In her Complaint, Plaintiff avers that on June 15, 2011, Defendant Wiseburn called her into his office and threatened to fire her if she would not "stare him in the eyes." Compl. 3. Plaintiff also indicated that Wiseburn was "always telling [her] how young and pretty" she was and that he "had a habit of always trying to get next to" her. *Id.* She said she avoided Wiseburn as much as she could, but

that he "became furious" with her, called her a sociopath, and "created a hostile environment due to" his threats, name-calling, and anger toward her. *Id.*

Plaintiff also submitted a document titled "Larry Wiseburn's Incident" along with her response to Defendants' Motion for Summary Judgment. ECF No. 60-1 at 2.[7] This paragraph-long document echoes the description in the Complaint, adding that, when Plaintiff would avoid Wiseburn, he "would become more and more angrier toward [her] by talking to [her] in a hostile tone of voice, rolling his eyes at [her], and looking at [her] with a look of madness." *Id.* At her deposition, Plaintiff testified she was suing Wiseburn for harassment and retaliation. Pl.'s Dep. 91-92. She indicated Wiseburn told others Plaintiff was crazy and did not come to her defense. *Id.* at 92. She said Wiseburn "is basically the mental abuse and intimidation." *Id.*

II.   Discussion

A.   Standard of Review

The court must liberally construe pleadings filed by pro se litigants. *Cruz v. Beto*, 405 U.S. 319, (1972). In considering a motion for summary judgment, the court's function is not to decide issues of fact, but to decide whether there is an issue of fact to be tried. The requirement of liberal construction of a pro se plaintiff's complaint does not mean that the court can ignore a clear failure in the pleadings to allege facts which set forth a claim. *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387 (4th Cir. 1990). Nor can the court assume the existence of a genuine issue of material fact when none exists. *See* Fed. R. Civ. P. 56(c). The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing

---

[7] It is unclear whether Plaintiff provided this to the EEOC or to Defendants prior to filing suit.

that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *See Anderson*, 477 U.S. at 255. However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.

All that is required is that "sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249. "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995). A party cannot create a genuine issue of material fact solely with conclusions in his or her own affidavit or deposition that are not based on personal knowledge. *See Latif v. The Cmty. Coll. of Baltimore*, 354 F. App'x 828, 830 (4th Cir. 2009) (affirming district court's grant of summary judgment, noting plaintiff's affidavit, which offered conclusions not based on his own knowledge, did not create genuine issues of material fact). In discrimination cases, a party is entitled to summary judgment if no reasonable jury could rule in the non-moving party's favor. *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002) (Title VII). The court cannot make credibility determinations or weigh the evidence, but the court should examine uncontradicted and unimpeached evidence offered by the moving party. *Reeves v. Sanderson*

*Plumbing Prods., Inc*., 530 U.S. 133, 150 (2000). The court must determine whether a party's offered evidence is legally sufficient to support a finding of discrimination and look at the strength of a party's case on its own terms. *See id.* at 148 (stating that "[c]ertainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational fact-finder could conclude that the action was discriminatory").

    B.    Analysis

In their Motion for Summary Judgment, Defendants argue they are entitled to judgment as a matter of law for the following reasons: Starting Point of Darlington is not a covered employer for purposes of Title VII claims; Plaintiff has not established a viable Title VII retaliation claim; and Plaintiff has not established an actionable Title VII claim for harassment/hostile work environment. Plaintiff disagrees, arguing she has presented genuine issues of material fact and has established her case sufficiently to have it considered by a jury. The court considers each argument in turn.

    1.    Title VII: Covered Employer

Title VII applies to an employer who has 15 or more employees working in each of 20 or more calendar weeks in the current or prior year. 42 U.S.C. § 2000e(b). The question of whether an employer falls within the definition of an "employer" covered by Title VII is an element of the Title VII causes of action, as opposed to a jurisdictional issue. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 509-516 (2006) (acknowledging previous circuit split on issue). In their principal brief in support of their Motion, Defendants briefly argue this matter should be dismissed in its entirety because Starting Point of Darlington is not an employer covered by Title VII because it has "never had fifteen or more employees at any time." Defs.' Mem. 5, ECF No. 56; Quenault Aff. ¶ 3, ECF No. 56-6. Quenault indicates she had previously worked at Starting Point of Florence, LLC prior to opening the Starting Point of Darlington Clinic. Quenault Aff. ¶ 3. She submits Starting Point of Florence and Starting Point of Darlington did

not share "employees, costs, or expenses." Quenault Aff. ¶ 3. Attached to Quenault's affidavit are payroll records for one pay period that indicate Starting Point of Darlington had only five employees. *See* ECF No. 56-6 at 7. Defendants indicate Quenault had requested additional payroll records and would provide them when available. Quenault Aff. ¶ 3. Defendants have provided no additional payroll records.

In response, Plaintiff provides evidence that she was at times paid by "Starting Point of Florence" and at times paid by "Starting Point of Darlington." *See* ECF No. 60-1 at 14 (pay period of June 6 through June 19, 2011—Plaintiff paid by "Starting Point of Florence Inc.;" ECF No. 60-1 at 15 (pay period of Sept. 17 through Sept. 30, 2011—Plaintiff paid by "Starting Point of Darlington LLC"). Plaintiff submits she has sued "Starting Point," and has not limited the suit to "Starting Point of Darlington." Pl.'s Mem. 6. In her deposition, Plaintiff noted she worked with Starting Point of Florence from June 13 through July 6, 2011, and with Starting Point of Darlington beginning July 6, 2011. Pl.'s Dep. 36-37. Plaintiff also submits Defendants Wiseburn and Quenault, as well as non-defendant "Dr. Merlin work the same positions just at different sites." Pl.'s Mem. 5. Plaintiff also notes she has the same employee identification number at both sites. *Id.* (referring to ECF No. 60-1 at 14-15; Plaintiff's employee number is "66" on paystubs for Starting Point of Florence and Starting Point of Darlington). Plaintiff also indicates she at times "picked up boxes of supplies from Starting Point of Florence and transported those same supplies to Starting Point of Darlington." Pl.'s Mem. 5.[8]

Although Defendants filed a Reply to Plaintiff's responsive memorandum, the Reply does not respond to Plaintiff's response regarding the covered-employer argument.

---

[8] Plaintiff further submits that Starting Point's "Payroll Journal" and "Paycheck Stub" indicate it "is a large company with a payroll of over one hundred employees[.]" Pl.'s Mem. 6 (presumably citing to ECF No. 60-1 at 14-15 (her paycheck stubs from Starting Point of Florence and Starting Point of Florence) and ECF No. 56-6 at 7 (Payroll Journal for Starting Point of Darlington). The court does not find these documents support this argument.

The employment-related documents submitted by Defendants indicate that the Job Description Plaintiff signed on June 13, 2011 references "Starting Point" generally, and does not make a distinction between Starting Point of Florence and Starting Point of Darlington. *See* ECF No. 56-1 at 2. The "Code of Ethics" signed by Plaintiff that same day references Starting Point of Darlington only, as does the "Certificate of Compliance." ECF Nos. 56-2 at 2, 56-3 at 2.

Plaintiff's Complaint names "Starting Point," and does not differentiate between Starting Point of Florence and Starting Point of Darlington. Compl. 3, ECF No. 1. Her Complaint includes an incident that took place June 15, 2011, at Starting Point of Florence, and the other incidents discussed in the Complaint took place at the Hartsville (Darlington County) site. *Id.* Quenault accepted service of the Summons issued to "Starting Point" that was mailed to 797 North Cashua Drive, Florence, SC, ECF No. 21-1 at 2, which is the address on the payroll records for Starting Point of Florence, ECF No. 60-1 at 14. Defendants submit in their Answer that Defendant "Starting Point" is correctly named "Starting Point of Darlington, LLC." Answer ¶ 1, ECF No. 25. Defendant indicated counsel would accept service of an amended summons and pleadings for Starting Point of Darlington, LLC. Defs.' Resps. to Rule 26.01, D.S.C. 2, ECF No. 26. No amended pleadings have been submitted.

Nothing in the record indicates what entity or entities were referenced in Plaintiff's charge to the EEOC.[9] The only information before the court regarding Plaintiff's administrative remedies is the Dismissal and Notice of Rights letter (commonly referred to as a "right to sue" letter) the EEOC issued to Plaintiff dated November 16, 2012. ECF No. 1-1. The letter indicates a copy was sent to Quenault, Director of Starting Point of Darlington. *Id.* No other information is before the court regarding the charges Plaintiff raised at the administrative level. The undersigned notes that the EEOC's "Dismissal

---

[9] In their Answer, Defendants also submitted Plaintiff's Complaint failed to state a claim upon which relief could be granted because Plaintiff "failed to file a timely administrative charge" as required by federal statutes and regulations. Answer ¶ 2. However, Defendants did not raise this argument in their Motion for Summary Judgment. Accordingly, the court does not consider that argument herein.

and Notice of Rights" form indicates one reason the EEOC may dismiss a matter is when a respondent "employs less than the required number of employees or is not otherwise covered by the statutes." *See* ECF No. 1-1. However, the EEOC did not dismiss Plaintiff's administrative claim for that reason. *See id.* (dismissing Plaintiff's charge because, "[b]ased upon its investigation, the EEOC is unable to conclude that the information obtained establishes violation of the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.").

Here, Plaintiff sued "Starting Point" and has provided specific evidence that she was paid by both Starting Point of Florence and Starting Point of Darlington. She has also provided information regarding shared resources between Starting Point of Florence and Starting Point of Darlington. Defendants submit Starting Point of Florence and Starting Point of Darlington are separate entities. However, they proffer no documentation or discussion in reply to Plaintiff's argument that she sued a covered entity. Based on the specific documents and information Plaintiff has provided here, and based on Defendants' failure to proffer any reply arguments to Plaintiff's arguments or to provide additional payroll documentation to supplement Defendant Quenault's affidavit on this matter, the undersigned finds it appropriate to consider the merits of Plaintiff's Title VII claims.[10]

---

[10] In making this recommendation, the undersigned is cognizant of the "integrated employer" test courts sometimes apply when considering whether an employer is a covered employer pursuant to Title VII. *See Hukill v. Auto Care, Inc.*, 192 F.3d 437, 442 (4th Cir. 1997) (considering "integrated employer" test in FMLA context). Plaintiff is proceeding pro se and has not raised her argument in such terms. Other than Quenault's initial affidavit and its attachments, Defendants have proffered no evidence or argument to rebut Plaintiff's argument. The question of whether an employer is subject to Title VII is an element of the Title VII causes of action, as opposed to a jurisdictional issue. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 509-516 (2006). Accordingly, the jury would appropriately consider contested facts as to this element. *See id.* at 514. Here, Plaintiff has at the least provided sufficient information to establish a question of fact as to this element of her Title VII claims. *Cf. Elliott v. U.S. Home Protect of Charleston, LLC*, C/A No. 2:08-3531-MBS, 2009 WL 2485959 (D.S.C. Aug. 13, 2009) (finding no issues of fact existed regarding numerosity element of Title VII matter; determining as matter of law employer was not covered entity; and granting defendant's motion for summary judgment on that ground).

2.   Title VII Retaliation

A plaintiff may demonstrate a violation of Title VII through direct or circumstantial evidence. When direct evidence is lacking, a plaintiff may produce circumstantial evidence and proceed under the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Pursuant to this framework, once the plaintiff establishes a prima facie case of a violation of Title VII, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for its employment action. *Merritt v. Old Dominion Freight*, 601 F.3d 289, 294 (4th Cir. 2010). If the defendant meets the burden to demonstrate a legitimate, nondiscriminatory reason for its employment action, the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the proffered reason was "not its true reason[ ], but [was] a pretext." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

Title VII makes it an "unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).  Absent direct evidence proof of retaliation, in order to establish a prima facie case for retaliation under Title VII, a plaintiff must show the following: "(1) she engaged in a protected activity; (2) the employer took an adverse employment action against her; and (3) a causal connection existed between the protected activity and the asserted adverse action." *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 271 (4th Cir. 2011) (internal quotation omitted).

If Plaintiff is able to establish a prima facie case for retaliation, Defendant can rebut the presumption by articulating a legitimate non-retaliatory reason for its action. Discussing a defendant's burden, the court has explained: "What shifts is merely a burden of producing admissible evidence

16

(something more than a pleading) that would, if believed, be legally sufficient to justify a judgment for the defendant." *Taylor v. Ingles Markets*, C.A. No. 802407227, 2004 WL 3591133, *5 (D.S.C. Dec. 13, 2004) (citing *Burdine*, 450 U.S. at 255). The employer, however, does not have the burden of persuading the court that it was actually motivated by the proffered reason. *Id.* "The employer's burden is satisfied if he simply 'explains what he had done' or 'produce[es] evidence of legitimate, nondiscriminatory reasons.'" *Williams v. Sonoco Prods. Co.*, C.A. No. 81-1469-0, 1982 WL 423, at *3 (D.S.C. Nov. 8, 1982) (citing *Bd. of Trustees of Keene State Coll. v. Sweeney*, 439 U.S. 25 (1978)). A plaintiff bears the final burden of proving that the reason given by a defendant is a pretext for unlawful retaliation. *Reeves*, 530 U.S. 133. In *Reeves*, the Supreme Court clarified a plaintiff's burden to show pretext once the employer articulates a legitimate reason for its adverse action. The Court held that a plaintiff may attempt to establish that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence. *Reeves*, 530 U.S. at 143. "The ultimate question is whether the employer intentionally discriminated, and proof that the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct." *Reeves*, 50 U.S. at 146 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 524 (1993)).

Recently, the United States Supreme Court clarified that, in the Title VII retaliation context, a plaintiff must prove retaliation was the but-for cause of the adverse employment action. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013). In other words, the successful plaintiff in a Title VII retaliation suit must show that the complained-of injury would not have occurred "but for" the alleged retaliatory motive. *Id.; see also id.* at 2524-25. In so holding, the Court rejected the argument that a Title VII retaliation claimant had to establish the lessened "motivating-factor" causation standard applicable to some status-based Title VII causes of action. *See* 133 S. Ct. at 2533-34. *See also Maliik v.*

*Sebelius*, 964 F. Supp. 2d 531, 550 (D. Md. 2013) (discussing *Nassar* and explaining the but-for causation standard "means that the employer would not have taken the adverse employment action against the plaintiff if the employer were not trying to retaliate against the plaintiff for engaging in a protected activity.").[11]

Plaintiff has not offered any direct evidence of retaliation, so the court considers her Title VII retaliation claim under the burden-shifting framework as detailed above.

In seeking summary judgment, Defendants cite the general law applicable to a Title VII retaliation claim. Defs.' Mem. 7-8. Although Defendants note the elements of a prima facie case, they do not specifically challenge whether Plaintiff has presented evidence to satisfy her prima facie case. Defendants submit that, after investigating the client grievance from J.B. regarding Plaintiff's interaction with J.B., the decision was made to terminate Plaintiff. Quenault Aff. ¶¶ 9-11, ECF No. 56-6. Defendants argue that Plaintiff "has no sufficient evidence connecting" the internal complaint she made to her termination using the but-for causation standard. Defs.' Mem. 9. On Reply, Defendants submit Plaintiff has not satisfied her burden of demonstrating the stated reasons for her termination—the confrontation with client J.B.—was merely a pretext for her being terminated in retaliation for her complaining of sexual harassment. *See* Defs.' Reply 2, ECF No. 61 (arguing "Plaintiff has not presented sufficient evidence to satisfy her burden of proving Defendants' stated reason for termination is pretext for unlawful retaliation, [nor] does she come close to satisfying her additional burden of showing

---

[11] The *Nassar* case was before the Court subsequent to a jury verdict, and the Court did not expressly focus on whether, at the summary-judgment stage, the but-for causation requirement would be considered as part of a plaintiff's prima facie case or part of the pretext analysis. At least one decision in this district has found the but-for causation standard applies not to the prima facie stage of a retaliation case, but to the pretext stage of the examination of a Title VII retaliation claim. *See Cason v. S.C. St. Ports Auth.*, No. 2:11-cv-2241-RMG, 2014 WL 588065, at *4 (D.S.C. Feb. 14, 2014) (citing *Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 846 (2d Cir. 2013) and finding but-for causation required by *Nassar* applied to pretext analysis, but not to the causation element of plaintiff's prima facie case). The undersigned considers the but-for causation requirement at the pretext stage herein.

retaliatory discharge would not have occurred but-for her internal complaints."). Accepting without deciding that Plaintiff established her prima facie case, the court considers whether she has established that Defendants' proffered legitimate, nondiscriminatory reason for terminating her was mere pretext for retaliation in violation of Title VII and whether she can satisfy the but-for causation test.

Plaintiff argues she was terminated because she participated in a protected activity: "the reporting of sexual harassment, sexual battery, verbal and mental abuse, and intimidation[,]" and submits she has established the requisite but-for causation because she "was fired after [she] reported the sexual harassment, sexual battery, verbal and mental abuse, and intimidation." Pl.'s Mem. 6. She argues that she "would have certainly not been fired if [she] had not complained[,]" as she had never received "any write-ups, bad evaluations or grievances." Pl.'s Mem. 6-7. She further submits there are no signed papers affirming Plaintiff was investigated for any "unprofessional problems relating to job title or clients." Pl.'s Mem. 7. She also proffers a document from the South Carolina Department of Employment and Workforce ("SCDEW") determining she was eligible for unemployment benefits. ECF No. 60-1 at 18. That document indicates that Plaintiff was discharged, that she maintains there was no wrongdoing on her part, and that "there is no evidence of improper actions connected with the work." *Id.* The SCDEW found that because "willful failure or intentional disregard of duty" had not been shown, a finding of discharge for cause in connection with work was not justified under applicable South Carolina law. *Id.* In addition, Plaintiff submits Defendants came up with their "contrived story," presumably about client J.B., only after the EEOC communicated with them. Pl.'s Mem. 7. Plaintiff argues this "story" is evidence of pretext. *Id.* She questions whether client J.B. actually wrote the complaint about her, noting he did not complete a grievance form that Starting Point typically uses when a client has a grievance against a Starting Point employee. Pl.'s Mem. 2. She also questions whether J.B. was "capable of typing a letter" like the one Defendants have submitted. *Id.* In addition, Plaintiff submits that the

confrontation between her and J.B. took place in mid-to-late September 2011, rather than October 24, 2011, the date Defendants indicate it took place. *Id.*

In Reply, Defendants proffer an affidavit from J.B. stating that his confrontation with Plaintiff took place on October 24, 2011, and authenticating his typed, signed request to change counselors. J.B. Aff., ECF No. 61-1. Defendants reiterate their argument that Plaintiff cannot satisfy her burden of proving Defendants' stated reason for terminating her was pretextual or that she would not have been terminated but-for her internal complaints. Defs.' Reply 2, ECF No. 61.

Plaintiff also submitted an "Opposition to Defendants' Addendum," in which she again attacks the evidence presented by Defendants. Pl.'s Surreply, ECF No. 63. Specifically, Plaintiff argues Defendants "made up" J.B.'s affidavit "at the last minute to try to save their pathetic defense." *Id.* at 1. In her brief, Plaintiff submits that portions of J.B.'s affidavit contradict his written statement, calling his veracity in question and submitting that J.B. has the "potential to get very angry and be confrontational at times[,]" for various reasons, including that he had been prescribed Xanax. *Id.* at 1-2.  Plaintiff also submits that, if she had tried to keep J.B. from leaving the office as his affidavit indicates, she would have been kidnapping him. She notes she has never been arrested for kidnapping and that, if she had been telling Plaintiff he could not leave, she "should have been arrested and straightaway terminated right on the spot." *Id.* at 2. Because she worked until November 2, 2011, she argues it follows that she did not try to keep J.B. from leaving Starting Point as he alleges. *Id.* Plaintiff also questions the validity of the documents attached to the affidavit, arguing there is no proof they were actually faxed and that the transmission report could have related to "any document or fax sent by someone else[.]" *Id.* at 3.

These arguments by Plaintiff miss the point. To establish actionable retaliation under Title VII, Plaintiff is required to demonstrate that she would not have been terminated *but for* her submitting the internal complaints. *Nassar*, 133 S. Ct. at 2533. In seeking summary judgment, Defendants have set

forth a specific reason for Plaintiff's termination that is unrelated to Plaintiff's filing any complaints: her confrontation with client J.B. and the way she treated J.B. *See, e.g.*, Quenault Aff. ¶¶ 9-11 (Quenault's relaying facts from client's written grievance, explaining she investigated the grievance, and explaining reasons for Plaintiff's termination).  As the court explained to Plaintiff in its December 20, 2013 Order concerning Plaintiff's response to Defendants' Motion (known as a "*Roseboro* Order"), Plaintiff was required to support her version of the facts with documents and other material as set forth in Federal Rule of Civil Procedure 56(c). ECF No. 57 at 2. Calling Defendants' proffered reason and evidence into question by arguing a document is false will not suffice to defeat summary judgment. The burden of demonstrating Defendants' stated nondiscriminatory reason for termination (or other adverse employment action) is not pretextual and of establishing that the adverse action would not have been taken but for the participation in a protected activity are on Plaintiff. *See Nassar*, 133 S. Ct. at 2533 (finding plaintiff-employee must show but-for causation); *Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 258 (4th Cir. 1998) (noting that, once employer provides legitimate, nondiscriminatory reason for action, burden of proving retaliation is on plaintiff-employee).

Plaintiff's attempts to discredit J.B. and call the complaint submitted by him into question are not sufficient to satisfy her burden. Defendant Quenault considered the complaint from J.B. and investigated it. Quenault Aff. ¶ 9. Quenault noted addiction counselors (such as Plaintiff) should not act vindictively or tear down the self-esteem of their clients. *Id.* ¶ 10. Guided by her investigative findings as to J.B.'s grievance and her "personal and professional values," Defendant Quenault made the business decision to terminate Plaintiff. *Id.* ¶ 11. Courts are not to second-guess an employer's decision on human resources matters, so long as such decisions are not based on an unlawful reason. "Once an employer has provided a non-discriminatory explanation for its decision, the plaintiff cannot seek to expose that rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity. . . ."

*Hux v. City of Newport News, Va.*, 451 F.3d 311, 315 (4th Cir. 2006). "[I]t is not [the court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998). Plaintiff cannot show that Defendants' stated reason for terminating her was not the real reason for her discharge. Her generalized personal beliefs and unsupported assertions are insufficient to carry her burden. *See Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874-75 (4th Cir. 1992) (noting nonmoving party may not rely on beliefs, conjecture, speculation, of conclusory allegations to defeat a motion for summary judgment). None of Plaintiff's arguments or documents provided with her briefs creates a genuine issue of fact as to Plaintiff's allegations regarding Defendants' retaliatory motive or as to her claim Defendants fabricated evidence they have provided in support of their Motion. Plaintiff has not satisfied her burden and her claim of retaliation in violation of Title VII matter should be dismissed as a matter of law.

### 3.  Title VII: Harassment/Hostile-Work-Environment Claim

Plaintiff also claims she was sexually harassed and that there was a "hostile environment" in the workplace. Compl. 3, ECF No. 1. In her Complaint, she outlines a June 15, 2011 incident in which Defendant Wiseburn called her into his office and "threatened to fire [her] if [she] didn't stare him in the eyes." *Id.* She also complains of incidents that happened from July 16, 2011 through November 2011 and involved sexual harassment by Defendants Quenault and Roundtree. *Id.* The court construes this as a Title VII sexual harassment claim.

Title VII states that "[i]t shall be an unlawful employment practice for any employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of . . . sex." 42 U.S.C. § 2000e-2(a)(1). Because the environment of the workplace is a term or condition of employment, Title VII creates a hostile work environment cause of action.

*Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 73 (1986); *EEOC v. R & R Ventures*, 244 F.3d 334, 338 (4th Cir. 2001).

To survive a motion for summary judgment on her claim of harassment in a sexually hostile work environment in violation of Title VII, Plaintiff must show that there is a genuine issue of material fact as to whether the offending conduct (1) was unwelcome; (2) was based on her sex; (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment; and (4) was imputable to her employer. *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003).

First, Plaintiff's allegations regarding Defendant Wiseburn do not satisfy the "because of sex" prong of her prima facie case. She relays an incident in which he called her into his office and threatened to terminate her if she did not stare into his eyes and claims he was "hostile" toward her and looked at her with a "look of madness" when she would avoid him. ECF No. 60-1 at 2. These allegations include nothing rising to the level of sexual discrimination. For those allegations, Plaintiff cannot establish the second prong of her hostile work environment claim.[12]

Plaintiff's additional allegations in this regard concern actions of female coworkers—Defendants Quenault and Roundtree. In the case of same-sex harassment, the United States Supreme Court has found that a plaintiff must demonstrate that the harassing conduct was not merely "tinged with offensive sexual connotation," but constituted discrimination because of sex. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79-81 (1998). *Oncale* directs that courts consider the context to make sure that they do not confuse "horseplay" for gender discrimination. *Id.* at 81–82.

---

[12] Even if Plaintiff could show Wiseburn's actions were because of Plaintiff's gender, Plaintiff cannot demonstrate the objective prong of the third element—that the actions were sufficiently severe and pervasive to alter employment conditions.

The complaints Plaintiff made in her "Incidents Report" submitted to her employer before termination focused on complaints regarding gossip, informal lunch groups, misplaced faxes, and computer issues. ECF No. 60-1. Although in the Incidents Report Plaintiff obliquely mentions she is "not responsible . . . for satisfying any staff members' sexual needs[,]" she does not set forth any specific incidents or allegations that indicate any offensive workplace conduct that focused on Plaintiff "because of her sex." For those allegations, Plaintiff cannot establish that portion of a hostile work environment claim. Even if they did, they cannot satisfy the third element—sufficiently severe or pervasive so as to alter employment conditions.

Assuming *arguendo* that Plaintiff's allegations against all Defendants could satisfy the "because of sex" prong, the court considers whether they satisfy the "severe or pervasive" element of Plaintiff's hostile work environment claim. That element "has both subjective and objective components." *Ocheltree*, 335 F.3d at 333.   First, Plaintiff must show that she "subjectively perceive[d] the environment to be abusive." *Harris v. Forklift Sys.*, 510 U.S. 17, 21-22 (1993). Next, Plaintiff must demonstrate that the conduct was such that "a reasonable person in the plaintiff's position" would have found the environment hostile or abusive. *Oncale*, 523 U.S. at 81-82.

In this case, Plaintiff has explained that Defendants would "become angry, yell, snap and call [her] a psychopath for not wanting them and not showing an interest in them." Pl.'s Mem. 7. She notes that she was "scared and wanted to fight at times but feared being fired" because of Defendants' threats. *Id.* Further, Plaintiff indicates she "felt powerless" over Wiseburn's actions toward her because she needed her job. ECF No. 60-1 at 2. Plaintiff has arguably demonstrated the *subjective* portion of the

24

"severe or pervasive" element of a hostile work environment claim—i.e., that *she* perceived Defendants' actions to be abusive.[13]

Plaintiff cannot satisfy the objective prong, however. Whether an environment is objectively hostile or abusive depends on factors such as: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. This standard is designed to "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal citation and quotation omitted). "Unlike other, more direct and discrete unlawful employment practices, hostile work environments generally result only after an accumulation of discrete instances of harassment." *Jordan v. Alt. Res. Corp.*, 458 F.3d 332, 339 (4th Cir. 2006). "Harassment reaches the sufficiently severe or pervasive level when it creates 'an environment that a reasonable person would find hostile or abusive' and that the victim herself subjectively perceive[s] . . . to be abusive.'" *Jennings v. Univ. of N.C*, 482 F.3d 686, 696 (4th Cir. 2007) (quoting *Harris*, 510 U.S. at 21). In this case, the court considers whether the conduct was sufficiently severe or pervasive to constitute a hostile work environment to an objectively reasonable female.

Considering all evidence in the light most favorable to her, Plaintiff cannot demonstrate that the allegedly harassing acts were "sufficiently severe and pervasive to alter the conditions of her employment and create an abusive work environment[,]" because she has not demonstrated that the complained-of events were such that a reasonable person in the environment would find them to be

---

[13] When comparing Plaintiff's subjective beliefs with those of objective "reasonable person" standard, the court notes that Plaintiff testified she thinks she is "dropdead gorgeous," gets "hit on" by lesbians two-or-three times per week, and gets "hit on" by men "just about all the time." Pl.'s Dep. 93-97, ECF No. 56-7. *See EEOC v. Fairbrook Med. Clinic, P.A.*, 609 F.3d 320, 328 (4th Cir. 2010) (explaining the objective prong of the test "is designed to disfavor claims based on an individual plaintiff's hyper-sensitivity").

hostile or abusive. *Ocheltree*, 335 F.3d at 331. In considering this portion of Plaintiff's case, the undersigned is reminded that "[t]he standard for proving an abusive work environment is intended to be a very high one"); *Harris v. Forklift Sys., Inc.*, 510 U.S. at 21–22.

Plaintiff alleges Defendant Quenault "hit her hand" against or "slapped" Plaintiff's breast and hit her in the breast with a roll of paper when the two were moving boxes on July 6, 2011. Pl.'s Dep. 80-81. Plaintiff noted Quenault did not say anything to her when she "slapped" her breast, but that she "smiled or whatever, giggled that laugh that [Plaintiff] can't stand." *Id.* at 82. Nothing about the contact made with Plaintiff's breast on that date has connotations that an objectively reasonable female would find hostile or abusive. Similarly, Plaintiff's various allegations concerning times Quenault "showed her breasts" to Plaintiff by wearing low-cut tops and propping her breasts on a table such that Plaintiff "could see the colored area of the nipples" do not rise to the level of acts that an objectively reasonable female would find create an abusive work environment. In fact, in describing these actions, Plaintiff testified that it was "unprofessional" for Quenault to have displayed her breasts in such a manner. Pl.'s Dep. 84. In claiming an abusive work environment based on sex, a Plaintiff must demonstrate more than behavior that is potentially "unprofessional." *See Oncale*, 523 U.S. at 80 (noting Title VII is not a "general civility code.").

Nor do Plaintiff's claims regarding unwanted touching of her buttocks by Quenault, Pl.'s Dep. 78-79, or Roundtree's showing Plaintiff pictures of women shaking their behind or "showing [Plaintiff] the crack of her buttocks where she stated she fell on the chair and hurt it[,]" Pl.'s Dep. 88-89, amount to conduct an objectively reasonable female would find to be sufficiently severe and pervasive so as to alter the conditions of employment. For example, Plaintiff testified Quenault "touched [Plaintiff's] butt with her hands" as Plaintiff "was squeezing by." Pl.'s Dep. 79. Plaintiff indicated Quenault touched her

buttocks intentionally and laughed, but did not say anything because Plaintiff went into her own office. *Id.* at 79-80.

As a matter of law, Plaintiff's allegations do not rise to the level of objectively actionable conduct. She has not presented evidence of actions that would unreasonably interfere with her work performance such that a reasonable jury could find a hostile work environment. *See Sunbelt Rentals, Inc.*, 521 F.3d at 315-16 (noting complaints that would objectively give rise to bruised or wounded feelings or incidents that are premised on nothing more than rude treatment, callous behavior, or a routine difference of opinion and personality conflict will not satisfy the severe or pervasive standard). Defendants' Motion for Summary Judgment as to Plaintiff's claims of harassment/hostile work environment should be granted.

III.    Conclusion

For the foregoing reasons, the undersigned recommends that Defendants' Motion for Summary Judgment, ECF No. 56, be granted and this case be dismissed.

IT IS SO RECOMMENDED.

May 12, 2014                                            Kaymani D. West
Florence, South Carolina                               United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**